Kacy HIGGINS *v.* STATE of Arkansas

CR 96-62                                                936 S.W.2d 740

Supreme Court of Arkansas
Opinion delivered December 23, 1996
[Petition for rehearing denied January 27, 1997.]

*John Wesley Hall, Jr.,* for appellant.

*Winston Bryant,* Att'y Gen., by: *Kent G. Holt,* Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. The appellant, Kacy L. Higgins, was convicted of the crime of theft of property, a Class B felony, in that he exercised unauthorized control over timber owned by other persons and valued in excess of $2,500. The charge arose after Higgins, pursuant to a contract with Calvin Sprinkle, accepted $8,750 from Sprinkle for the removal of timber located on and adjacent to property known as "5803 West Barraque Street" in Pine Bluff. Higgins's defense was that he was entitled to sell the timber because he and his fiance, Barbara Shepherd, had entered into a contract to purchase the house and land located at that address, and that he was the equitable owner of the property. Higgins ultimately received a sentence of five years' probation and a $3,000 suspended fine contingent upon his compliance with the conditions of probation. We affirm the judgment.

On November 12, 1994, Higgins and Shepherd entered into an offer and acceptance for the purchase of land located at 5803 West Barraque Street in Pine Bluff, with Rick Pierce and Betty Schrantz signing as the designated sellers. The agreement called for a purchase price of $22,000 and was contingent upon three occur-

rences: (1) the buyers' obtaining suitable financing; (2) the land having an appraised value equal to or greater than $22,000; and (3) a survey reflecting that the land was three acres or more in size. The offer and acceptance called for possession to be transferred upon closing but allowed the buyers access to the property to make repairs to the house in advance of closing to facilitate financing. The house was in a state of disrepair and had been unoccupied for a period of time.

It developed at trial that the property located at 5803 West Barraque Street contained a parcel of land with 2.76 acres. Immediately adjacent to and west of that property was a strip of land containing 1.1 acres held in the name of a partnership known as "SS&P Partnership." Rick Pierce testified that the partnership was composed of himself, his wife, and her two brothers. A central issue at trial was whether the 1.1 acres of land was included within the agreement to purchase and convey 5803 West Barraque Street. The information charging Higgins with theft stated only that Higgins exercised unauthorized control over timber owned by Rick Pierce. It did not differentiate between timber located on the 2.76 acre tract and timber located on the 1.1 acre tract.

Carroll Austin, the real estate agent who negotiated the sale, testified that he knew the offer and acceptance was based on 3 acres and later assumed that the 1.1 acre tract was included in the sale of the Barraque Street property. But he added that Rick Pierce never represented to him that this was the case. He testified that he told Higgins in person on the morning of February 3, 1995, that the 1.1 acre tract was not part of the 5803 West Barraque Street land sale. Calvin Sprinkle also testified for the prosecution. He explained that he was in the timber business and that he was contacted by Higgins on the night of February 3, 1995, about purchasing some timber. He struck an agreement with Higgins and testified that he cut approximately one acre of timber located on and around Higgins's yard on February 6, 1995. He further related to the jury that on the written contract, Higgins marked out the February 6, 1995 date and back-dated the contract to January 20, 1995. He stated that he could not remember Higgins's explanation for doing this. Sprinkle testified that later that day, Higgins requested immediate payment because he needed to have an operation on his head. Higgins was paid $8,750 for the timber by Sprinkle's company.

Rick Pierce testified that timber had been taken from both the

2.76 acre tract and the 1.1 acre tract. He added that he gave no one the authority to cut the timber. He also testified as to the amount of acreage involved in the sale of 5803 West Barraque Street. He explained that his instructions to Carroll Austin were to sell the house and the land associated with it. He stated that he never intended to sell the 1.1 acre tract, and he confirmed that the two tracts, in fact, had separate owners.

Barbara Shepherd testified for the defense. She stated that when she and Higgins entered into the contract to purchase 5803 West Barraque Street, they were not told that the 1.1 acre tract was excluded. She testified at length as to the expenditures of time and money made by herself and Higgins in renovating the dilapidated property on the 2.76 acre parcel. She also testified about the events leading up to the removal of timber. She stated that on February 3, 1995, Higgins called her at work to tell her that he had learned that the 1.1 acre tract was not included within the sale of the property. She testified that as of that date, a survey had recently been done, reflecting the land to be 3.86 acres in size, thus including both tracts. She stated that it was her belief that a second survey, reflecting only the 2.76 acre tract, was performed after the timber was cut.

Higgins testified in his own defense that he had a contract to purchase both tracts of land. He relied in part on the survey done for 3.86 acres of land and a newspaper advertisement that reflected the 5803 West Barraque Street property was "over 3 acres," to reach this conclusion. He further related to the jury a conversation he had with Carroll Austin on February 3, 1995, which differed dramatically from Austin's rendition of the same event. He stated that Austin came out to the property and was "crying and pacing the floor" and told him he had made a mistake. But according to Higgins, Austin never told him that the 1.1 acre tract was excluded.

As to back-dating the contract between Sprinkle and himself, Higgins explained that he did so because a number of people had come by the property asking to purchase the timber and that he back-dated the contract in order to avoid a conflict and to make it look as though the agreement had been previously negotiated. His reasons for cutting the timber, he said, were for security purposes. He explained that because the property was close to a prison, he feared that escaped inmates would hide in the woods by the home. He explained that he wanted immediate payment from Sprinkle because he needed the money for surgery on his eye and for the

removal of air pockets from his mouth.

## I. Equitable Conversion

Higgins first challenges his conviction under the doctrine of equitable conversion. At the close of the State's case, Higgins moved for a directed verdict on grounds that he was the equitable owner of the property and that, as a matter of law, there was no showing of the requisite intent to commit the crime because of his good faith belief in his ownership of the timber in question. The motion, which was writ'ʻʻ and submitted to the court, was denied. Higgins's abstract reflects that he renewed the motion at the close of all the evidence. The State argues that Higgins never obtained a timely ruling from the trial court on his renewal motion, but the State is wrong in this respect. The abstract reflects a ruling, and the record evidences the fact that the trial court denied the renewed motion in chambers at the beginning of the conference on instructions.

The law with respect to the denial of a directed-verdict motion was restated recently in *Peeler v. State*, 326 Ark. 423, 427, 932 S.W.2d 312, 314 (1996):

> A motion for directed verdict is a challenge to the sufficiency of the evidence. *Stewart v. State*, 320 Ark. 75, 894 S.W.2d 930 (1995); *Evans v. State*, 317 Ark. 449, 878 S.W.2d 409 (1994). The test is whether the verdict is supported by substantial evidence, direct or circumstantial. *Evans v. State, supra; Thomas v. State*, 312 Ark. 158, 847 S.W.2d 695 (1993). Substantial evidence is evidence of sufficient certainty and precision to compel a conclusion one way or another. *Evans v. State, supra; Coleman v. State*, 314 Ark. 143, 860 S.W.2d 747[] (1993). We review the evidence in the light most favorable to the appellee. *Id.*

A person commits theft of property if he "[k]nowingly takes or exercises unauthorized control over, or makes an unauthorized transfer of an interest in, the property of another person, with the purpose of depriving the owner thereof." Ark. Code Ann. § 5-36-103(a)(1) (Supp. 1995). "Property of another person," as defined by the Arkansas Code, does not include "property in the possession of the actor in which another has only a security interest, even though legal title is in the secured party pursuant to a conditional sales contract or other security agreement." Ark. Code Ann. § 5-36-101(7) (Repl. 1993). Higgins urged at trial, as he does now on

appeal, that the State failed to prove that the timber was the "property of another person" because of the doctrine of equitable conversion.

■ Higgins's argument is not persuasive. The offer and acceptance for the sale of the Barraque Street property is unclear on precisely what acreage was included. Both the State and Higgins presented proof on this point. The evidence by the State was that Higgins knew he had no ownership interest in the 1.1 acre tract where much, if not most, of the timber was cut. Carroll Austin testified that he informed Higgins on the morning of February 3, 1995, that the 1.1 acres of land was not included in the offer and acceptance. This testimony was also substantiated by Barbara Shepherd, who testified that Higgins called her at work that day to tell her that he had been told the 1.1 acres was not included. Calvin Sprinkle then revealed that he received a phone call the night of February 3, 1995, regarding the purchase of timber. He also testified that Higgins back-dated their agreement to reflect a date of January 20, 1995, a date prior to his knowledge of the status of the 1.1 acre tract. Viewing this evidence in the light most favorable to the State, as we must, we conclude that there was substantial evidence that Higgins was not operating in good faith and knew he did not own the 1.1 acres prior to his selling the timber. This being the case, we will not consider the doctrine of equitable conversion with respect to this tract.

As already stated, the record is not clear about where the timber was cut. Because ownership of the 1.1 acres was a paramount issue at trial, it is logical to assume most of the timber was cut from that acreage. Indeed, Higgins's counsel admitted as much at oral argument. The purchase price for the timber was $8,750. Thus, it is reasonable to conclude that theft of property in excess of $2,500 would have occurred in connection with timber taken from the 1.1 acre tract.

■■ But even assuming that the theft occurred solely on the 2.76 acre tract, the doctrine of equitable conversion has no application in the criminal context. We agree with the conclusion reached by the Supreme Court of Colorado, when the doctrine was raised as a criminal defense:

> Equitable conversion, however, is a civil property law doctrine often invoked to ascertain the rights and duties of

contracting parties and those claiming under them in relation to real estate as the result of a specifically enforceable contract between them. (Citing authority.) We know of no justification to extend the doctrine to this case, which involves a criminal charge of fraudulently selling land to a third party . . . .

*People* v. *Alexander*, 663 P.2d 1024, 1030-31 (Colo. 1983). The trial court did not err in denying the motion for directed verdict.

## II. Sentencing

When the jury first returned from its sentencing-phase deliberations, it fixed a sentence of zero imprisonment and a zero fine. One year of probation was suggested. Because the range of sentencing for theft of property over $2,500 is a fine not exceeding $15,000 or imprisonment from five to twenty years [Ark. Code Ann. §§ 5-4-201(a)(1) and 5-4-401(a)(3) (Repl. 1993)], or both, the trial court concluded that this was not a legal sentence and sent the jury back to deliberate once more. *See* AMCI 2d 9103. The jury returned with a sentence of a $3,000 fine and no imprisonment, with a suggestion of five years' probation. The trial court's order of probation provided for the fine and probationary sentence and that the fine would be suspended conditioned on satisfactory completion of probation.

Higgins's sole contention under this point is that the trial court should have allowed the first sentence to stand. However, Higgins has made it clear that he does not want the matter remanded for resentencing. Under our bifurcated trial procedure, the jury fixes punishment following the penalty phase of the trial. Ark. Code Ann. § 5-4-103 (Repl. 1993). It is further clear that the jury may recommend an alternative sentence such as suspension or probation. Ark. Code Ann. § 16-97-101(4) (Supp. 1995). *See Hill* v. *State*, 318 Ark. 408, 887 S.W.2d 275 (1994); AMCI 2d 9111. The actual assessment of probation, however, is a matter that lies within the discretion of the trial court. Ark. Code Ann. § 5-4-301 (Repl. 1993); *Hill* v. *State, supra.*

The first question before us is whether an imprisonment of zero years falls within the statutory range of from five to twenty years. Ark. Code Ann. § 5-4-401(a)(3) (Repl. 1993). The answer is that it does not, as zero imprisonment is no imprisonment at all. The next question is whether a fine of zero dollars is a fine not

exceeding $15,000. Ark. Code Ann. § 5-4-201(a)(1) (Repl. 1993). Common sense tells us that something with no quantity or magnitude is, in fact, nothing. There was no fine in this case. The jury could have given a term of imprisonment or a fine or both, but instead, it seized none of these options. The sentence was clearly improper, and the trial court did not err in sending the jury back to reconsider the matter.

The cases cited by Higgins for the proposition that it is error to require imprisonment actually stand for the principle that it would be error to require both a term of imprisonment *and* a fine. *See Bolden v. State,* 262 Ark. 718, 561 S.W.2d 281 (1978); *Brown v. State,* 261 Ark. 683, 250 S.W.2d 776 (1977). Those cases are simply not relevant to the facts of this case.

■ Again, there was no error committed by the trial court with respect to sentencing.

### III. Urine Testing

The order of probation was entered nine days after trial and included as one condition of probation: "Defendant shall not abuse alcohol nor use illegal drugs while on probation and shall submit to periodic drug screen testing as directed by probation officer." As noted by Higgins, this was the first mention of drug-screen testing in the matter. He now argues that the urine testing was imposed on him without justification and is violative of the Fourth Amendment, though this argument was not made to the trial court.

■ There are only four exceptions to this court's rule that errors may not be considered for the first time on appeal: 1) when an error is made by the trial court without knowledge of the defense counsel and without opportunity to object; 2) when a trial court should intervene on its own motion to correct a serious error by admonition or mistrial; 3) when evidentiary errors affect a defendant's substantial rights although they were not brought to the court's attention; and 4) when prejudice is conclusively shown by the record in death penalty cases and would unquestionably require relief under Ark. R. Crim. P. 37. *Marshall v. State,* 316 Ark. 753, 875 S.W.2d 814 (1994); *Wicks v. State,* 270 Ark. 781, 606 S.W.2d 366 (1980). Higgins contends that he falls within the first exception because he had no notice of this condition and, thus, no opportunity to object to the urine testing in the probation order.

■ The final order in this case, which was the order of probation and which included the urine testing, was entered on September 28, 1995. The order shows a copy going to "Attorney for Defendant." Higgins apparently met with the Adult Probation Office on September 20, 1995, which was the day after his sentencing. Notice of appeal was filed by Higgins on October 17, 1995. We find it to be somewhat incredible that Higgins did not know about a condition of his probation prior to his appeal. Moreover, Higgins and his counsel are charged with knowledge of when the final order was entered in this case, because that commences the time for appeal. *See, e.g., Nance* v. *State*, 318 Ark. 758, 891 S.W.2d 26 (1994). Indeed, Higgins appealed from that order of probation 19 days after the order was entered. It necessarily follows that they are likewise charged with knowledge of what is in that final order.

■ Under our criminal rules, Higgins had 30 days from the date of that order to file some motion for relief with the trial court. Ark. R. Crim. P. 33.3, formerly Ark. R. Crim. P. 36.22; Ark. R. App. P. 2(a)(1). We have held in other contexts that a matter pertaining to a final order should be raised to the trial court. *See Williams* v. *State*, 320 Ark. 498, 898 S.W.2d 38 (1995) (appellant voiced no objection to 75-year sentence at trial); *Oglesby* v. *Baptist Medical System*, 319 Ark. 280, 891 S.W.2d 48 (1995) (appellant did not raise issue of whether battery claim was included in dismissal order to trial court and, thus, waived it). The same rationale should certainly apply to a condition of probation. No motion challenging the urine testing as a condition of probation was filed. Hence, we will not consider the issue for the first time on appeal.

Affirmed.